No. 81-466

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

DONOVAN LaVALLEY,

Defendant and Appellant.

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable Douglas Harkin, Judge presiding.

Counsel of Record:

For Appellant:

Ian Christopherson argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mark Murphy, Assistant Attorney General, argued,
Helena, Montana
Robert L. Deschamps III, County Attorney, argued,
Missoula, Montana

Submitted:    February 28, 1983

Decided:    April 14, 1983

Filed: APR 14 1983

_____
Ethel M. Harrison
                              Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant appeals from his convictions of deliberate homicide and aggravated kidnapping entered in the District Court of the Fourth Judicial District, in and for the County of Missoula.

Defendant shot and killed William Homer Rock, III, on April 10, 1980, at the Nauditt residence, south of Lolo, Montana. The events leading up to the shooting are as follows. Defendant married Penny Nauditt in the summer of 1979. Defendant and Penny Nauditt had a stormy marriage which precipitated numerous fights and separations. In December 1979, Penny obtained a divorce from defendant in a Missoula District Court. In January 1980, defendant and Penny began living together again. However, the reunion was short-lived and they soon separated.

After being away for a few weeks, defendant returned to Lolo on or about April 8, 1980. On that day defendant saw Penny at the Lolo post office. They talked without incident. On April 9, defendant and Penny had lunch together at the Country Kitchen in Missoula. Penny testified the meeting was only to set things straight so they could have a clean break. She claims she did not intend to see defendant again. Defendant testified they had lunch and agreed to meet later that evening when Penny got off work. Penny then went to work at her father's bar, the Golden Goose in Lolo. When Penny finished working, she stayed at the Golden Goose to drink with some friends. Defendant called the Golden Goose when Penny did not come to meet him but she would not take his calls.

At approximately 9:30 p.m., Penny called William Homer Rock, III, from the Golden Goose and asked him if he would like to babysit her. Rock came to the Golden Goose and drank with Penny until approximately 1:00 a.m. At that time Penny and Rock left the bar in separate vehicles, and drove to the Nauditt residence where Penny was staying. Penny's parents, the Nauditts, were out of town and Penny claims she asked Rock to stay with her for pro-

- 2 -

tection. When they arrived at the Nauditt's residence, Penny and Rock smoked marijuana, then went to bed together.

At approximately 2:00 a.m., defendant decided to drive to the Nauditt residence to check on Penny. When he arrived at the residence, he found Rock's pickup truck, which he did not recognize, parked in the driveway. Defendant opened the hood on Rock's pickup truck and removed the distributor cap. He testified he was concerned about Penny's safety and wanted to prevent a possible intruder's escape while defendant entered the house through a downstairs window. When Penny and Rock heard defendant open the downstairs window, they got out of bed to investigate. Penny obtained her father's .22 caliber pistol which was sitting on the headboard bookcase. As defendant entered the house through the window and came up the stairway, he disconnected a phone which was ringing. When he reached the bedroom door he found Penny and Rock standing together. Both were naked. Defendant testified Rock pointed the gun at him and defendant reacted by striking Rock. Defendant and Rock had a brief struggle in the bedroom, and defendant took the gun from Rock. Defendant testified the gun fired during the struggle but admitted he had obtained possession of it. Penny testified defendant had taken the gun from Rock and fired it as she and Rock backed away. The bullet struck Rock in the abdomen and exited just below the main hipbone. The bullet did not strike any major organs but did sever the right iliac vein and created a large hole in the right iliac artery. At trial, Dr. John Pfaff testified Rock died from loss of blood but probably lived at least ten to fifteen minutes after the shooting.

After Rock was shot, defendant kicked Rock in the head to keep him from getting another gun. Defendant then unplugged the upstairs phone and left with Penny. Defendant testified Penny came willingly, Penny claims defendant forced her to go with him. Penny testified defendant forced her to lay on the floor of his pickup truck while they drove toward Hamilton. She testified

defendant pulled off the highway and stopped on the Trapper Creek Road where he proceeded to beat and rape her. Defendant testified they stopped at Trapper Creek to talk and that Penny wanted to make love but he refused. While they were at Trapper Creek, the pickup became stuck in mud on two separate occasions. Each time defendant got out of the truck to push and Penny drove. Penny did not attempt to escape on either occasion, but she does not recall why. After they got the pickup unstuck, defendant and Penny drove to Salmon, Idaho, and got a motel room. Defendant testified he knew he was in trouble but defendant wanted to wait for a few days until he could talk to his lawyer.

Defendant registered at the motel under a false name. After registering, Defendant and Penny went to the motel room to rest. At approximately 2:00 p.m. on April 10, Penny requested defendant to retrieve some aspirin from his pickup which he did. Later they proceeded to go downtown. Defendant went into a clothing store and bought clothes for Penny while she waited in the pickup. Defendant then went to a drugstore to by insulin as he is a diabetic. Again, Penny waited in the pickup. After defendant finished shopping, they purchased food at an A & W drive-in and returned to the motel.

Early in the evening the motel manager called and told defendant someone had collided with defendant's pickup. When defendant went outside, he was surrounded by Salmon police officers and arrested. The Salmon police had been alerted by the Missoula Sheriff's office. The police found the .22 pistol in the back of defendant's pickup in a box of clothing. The police found Penny in the motel room. From her condition, it appeared she had been beaten about the mouth and head. She also had clumps of hair torn from her head. They sought medical treatment for both Penny and defendant and placed them into the custody of the Missoula County Sheriff's office.

When defendant was returned to Missoula, the Missoula County Attorney's office filed an Information charging defendant with

- 4 -

deliberate homicide and aggravated kidnapping. A jury trial commenced in District Court on April 20, 1981. During the proceeding, defendant's counsel, among other things: stipulated to the admission of a color photograph of the victim; called six witnesses which he had not spoken with to testify about Penny's reputation, none of which had any opinion or personal knowledge of Penny's reputation; did not present an instruction on self-defense, and objected to the introduction of a self-defense instruction by the State; and stated to the jury during closing arguments that this was not a case of mitigated deliberate or negligent homicide and requested the jury to find defendant guilty of deliberate homicide or acquit. On April 24, 1981, the jury returned a verdict of guilty to the charges of deliberate homicide and aggravated kidnapping. Defendant appeals.

Defendant raises several issues for review. We find one issue to be dispositive; whether the omissions and deficiencies of defense counsel amount to a denial of defendant's constitutional right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and by Section 24, Article II of the Montana Constitution.

We note other instances of ineptness in the record which, although have less substantial nature than the issues above, indicate a general lack of skill and preparation from the part of the defense counsel. In evaluating defense counsel's representation, it is not our function to second-guess trial tactics and the strategy. See, United States v. DeCoster (D.C. Circuit), 487 F.2d 1197. They noted that: "We . . . presume that the trial counsel, appointed or retained, conscientiously seek, within the limits of preparation, ability, and knowledge of the law, and skill at trial, to accomplish a successful result for his client." We note that reasonably effective counsel does not mean that the defendant is constitutionally guaranteed such assistance of counsel as will necessarily result in his acquittal. See, Stewart v. People (1972), 179 Colo. 31, 498 P.2d 933.

Historically, in Montana and elsewhere, the burden has been heavy on one who seeks to reverse a judgment on the grounds of incompetency of counsel.

In State v. Rose (1980), _ ___ Mont. ___ , 608 P.2d 1074, 37 St.Rep. 642, this Court adopted the "reasonably effective assistance test" as stated by the Ninth Circuit Court of Appeals in Cooper v. Fitzharris (Ninth Cir. 1978), 586 F.2d 1325:

> "Persons accused of crime are entitled to the
> effective assistance of counsel acting within
> the range of competence demanded of attorneys
> in criminal cases." State v. Rose, 608 P.2d
> at 1081.

Until that case, the test in this State had been one which established the standard as being that of "bad faith, sham, or farcical representations."

This standard has since been applied in State v. Kubas (1982), _____ Mont. _____ , 642 P.2d 147, 39 St.Rep. 456, and Fitzpatrick v. State (1981), ___ Mont. _ ___, 638 P.2d 1002, 38 St.Rep. 1448. Here, defendant bases his claim of ineffective assistance of counsel upon specific acts and omissions at trial. Again, citing Cooper, supra, this Court stated in Rose, supra:

> "Where the claim of ineffective assistance of
> counsel rests upon specific acts and omissions
> of counsel at trial, as it does in this case,
> relief will be granted only if it appears that
> the defendant was prejudiced by counsel's
> conduct." State v. Rose, 608 P.2d 1081.

Generally, the rationale of these early ineffectiveness of counsel cases was based solely on due process motions. See, Bazelon The Defective Assistance of Counsel, 42 University of Cincinnati Law Review, p. 1. With the landmark case of Gideon v. Wainewright (1962), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, however, the right to counsel was recognized as standing on its own as one of the fundamental human rights essential to a fair trial. See McMann v. Richardson (1970), 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, wherein the court elucidated on and gave a renewed emphasis to this right when it stated that: "if the right to counsel guaranteed by the constitution is to serve its purpose, defendants cannot be left to their mercies of incom-

petent counsel . . ." In a similar vein, Mr. Justice Schaffer of the Illinois Supreme Court noted: "of all the rights that an accused person has, the right to be represented by counsel, is by far the most pervasive, for it affects his ability to assert any other rights he may have." See, Schaffer, Federalism and State Criminal Procedure, 70 Har.Law.Rev. 1.

Recognizing the constitutional guarantee of assistance of counsel is a guarantee with a purpose -- that purpose being to assure that our adversary system of justice is really adversary and really does justice -- we will not paper over the cracks in the house that Gideon built by hesitating to provide an ample, meaningful standard in cases of an alleged incompetency of criminal defense counsels.

In the present case, we find defendant was prejudiced by counsel's conduct. Numerous examples of prejudicial conduct are contained in the record. The first example involves counsel's failure to interview six character witnesses which he called to testify at the trial. Counsel had not spoken with any of the witnesses prior to trial. Although counsel was attempting to attack the character of Penny Nauditt, none of the witnesses had any opinion as to Penny Nauditt's character. Had these witnesses been able to attack Penny Nauditt's character, they might have damaged the State's case. Instead, their testimony merely demonstrated counsel's lack of investigation and preparation prior to trial.

The next example involves counsel's failure to present competent jury instructions to the District Court. Again, this demonstrates a complete lack of preparation. As a result, counsel did not present to the jury any logical defenses to the charges. In this case, the State, in an attempt to protect the record, introduced the instruction on self-defense and counsel argued against that instruction. In addition, he failed to argue there were any mitigating circumstances. During closing arguments, counsel argued defendant did not act in self-defense:

> "So, implying that he had the gun, he probably pulled the trigger in self-defense, if you will believe that garbage you will believe anything. You might as well convict him."

And, counsel stated the following about negligent homicide:

> "then, if you don't like that, then you can go on down to negligent homicide and what that means, I have no idea. There was nobody that was negligent that night. There was no accident at all. There was no accident."

These statements by counsel left the jury with only one option -- conviction of deliberate homicide. A reasonably competent attorney acting as a diligent conscientious advocate would not have made such errors. As such, we find defendant was denied his constitutional right to effective assistance of counsel. Therefore, we hold the convictions of deliberate homicide and aggravated kidnapping must be reversed and order this cause be remanded to the District Court for a new trial.

Reversed and remanded.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices